IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TRI D. NGUYEN,

      Plaintiff,               No. 2: 10-cv-1461 WBS KJN P

    vs.

BARTOS, et al.,                <u>ORDER AND</u>

      Defendants.         <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

        Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the court is defendant Bartos' summary judgment motion filed September 23, 2011.  For the following reasons, the undersigned recommends that defendant's motion be granted.

        At the outset, the undersigned observes that plaintiff has not opposed defendant's motion.  On October 11, 2011, plaintiff filed a motion for a sixty day extension of time to file an opposition.  On October 17, 2011, the undersigned granted this request.  On December 7, 2011, plaintiff filed a motion for appointment of counsel.  In this motion, plaintiff alleged that he had a limited understanding of the English language.  Plaintiff also stated that he could not read or write English very well.  Plaintiff alleged that he did not understand the law.  For these reasons,

1

1   plaintiff alleged that he could not prepare an opposition to defendant's summary judgment

2   motion.

3          On April 13, 2012, the undersigned denied plaintiff's December 7, 2011 motion

4   for appointment of counsel.  The April 13, 2012 order set forth the standard for evaluating

5   requests for counsel:

> The United States Supreme Court has ruled that district courts lack
> authority to require counsel to represent indigent prisoners in
> § 1983 cases.  Mallard v. United States Dist. Court, 490 U.S. 296,
> 298 (1989).  In certain exceptional circumstances, the court may
> request the voluntary assistance of counsel pursuant to 28 U.S.C.
> § 1915(e)(1).  Terrell v. Brewer, 935 F.2d 1015, 1017 (9th Cir.
> 1991); Wood v. Housewright, 900 F.2d 1332, 1335-36 (9th Cir.
> 1990).

11  (Dkt. No. 57 at 1-2.)

12         In the April 13, 2012 order, the undersigned stated that he did not find the

13  required exceptional circumstances.  The undersigned stated that plaintiff's pleadings to date

14  indicated that plaintiff was not illiterate, although his knowledge of the English language was

15  limited.  The undersigned observed that there was one defendant in this action, defendant Bartos.

16  Plaintiff alleged that defendant Bartos refused to take him to a dental appointment and falsely

17  charged him with a rules violation in retaliation for plaintiff filing a grievance against him.  The

18  undersigned found that these issues were not particularly complex.  For these reasons, the

19  undersigned denied plaintiff's motion for appointment of counsel and granted him thirty days to

20  file an opposition to defendant's motion for summary judgment.

21         On May 3, 2012, plaintiff filed a letter with the court stating that he could not find

22  anyone to help him prepare his opposition.  In this letter, plaintiff states that he is unable to

23  prepare the opposition himself.  Attached to plaintiff's letter is a copy of what purports to be

24  plaintiff's latest TABE score, indicating a reading score of 2.9 and a language score of 1.5.[1]

25  _____

26         [1] "The TABE (Tests of Adult Basic Education) scores reflect an inmate's educational
    achievement level and are expressed in numbers reflecting grade level."  See In re Roderick, 154

2

1    The undersigned is sympathetic to plaintiff's limited English language and reading

2    skills.  However, the court does not have the resources to appoint counsel for every prisoner with

3    limited English language and reading skills who files a civil rights action.  Having again

4    considered the issue, the undersigned finds that appointment of counsel is not warranted.

5    In evaluating defendant's motion, the undersigned has considered plaintiff's

6    verified amended complaint.  (Dkt. No. 15.)  A verified complaint may be used as an opposing

7    affidavit under Federal Rule of Civil Procedure 56, if it is based on personal knowledge and sets

8    forth specific facts admissible in evidence.  See Schroeder v. McDonald, 55 F.3d 454, 460 &

9    nn.10–11 (9th Cir.1995) (treating plaintiff's verified complaint as opposing affidavit where,

10   even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty

11   of perjury that contents were true and correct, and allegations were not based purely on his belief

12   but on his personal knowledge).

13   For the reasons stated herein, defendant's summary judgment motion should be

14   granted.

15   II. Legal Standard for Summary Judgment

16   Summary judgment is appropriate when a moving party establishes that the

17   standard set forth in Federal Rule of Civil Procedure 56(c) is met.  "The judgment sought should

18   be rendered  if . . . there is no genuine issue as to any material fact, and that the movant  is

19   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

Cal.App.4th 242, 253 n.5, 257 n.10 (2007); see also Marcelo v. Hartley, 2008 WL 4057003, *4
n.7 (C.D.Cal. 2008).

1   burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

2   in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

3   file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

4   upon motion, against a party who fails to make a showing sufficient to establish the existence of

5   an element essential to that party's case, and on which that party will bear the burden of proof at

6   trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the

7   nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.  In such a

8   circumstance, summary judgment should be granted, "so long as whatever is before the district

9   court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

10  satisfied."  Id.

11              If the moving party meets its initial responsibility, the burden then shifts to the

12  opposing party to establish that a genuine issue as to any material fact actually exists.  See

13  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

14  establish the existence of such a factual dispute, the opposing party may not rely upon the

15  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

16  form of affidavits, and/or admissible discovery material, in support of its contention that the

17  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

18  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

19  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

20  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

21  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

22  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

23  1436 (9th Cir. 1987).

24              In the endeavor to establish the existence of a factual dispute, the opposing party

25  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

26  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

4

1    versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

2    judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

3    genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

4    committee's note on 1963 amendments).

5            In resolving a summary judgment motion, the court examines the pleadings,

6    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

7    any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

8    477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

9    court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

10   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

11   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

12   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

13   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

14   show that there is some metaphysical doubt as to the material facts . . .  Where the record taken

15   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

16   'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

17   III.  Discussion

18               A.  Claim One–Alleged Denial of Dental Treatment

19            Plaintiff alleges that defendant Bartos violated his Eighth Amendment right to

20   adequate medical care by refusing to take him to a dental appointment.  Defendant moves for

21   summary judgment on the grounds that he did not violate the Eighth Amendment and on the

22   grounds that he is entitled to qualified immunity.

23               *Legal Standard for Eighth Amendment Claim*

24            Generally, deliberate indifference to a serious medical need presents a cognizable

25   claim for a violation of the Eighth Amendment's prohibition against cruel and unusual

26   punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  According to Farmer v. Brennan, 511

U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the prison official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  The deliberate indifference standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'"  McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).  Specifically, a determination of "deliberate indifference" involves two elements:  (1) the seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to those needs.  McGuckin, 974 F.2d at 1059.

First, a "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id. (citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for medical attention include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.  McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

Second, the nature of a defendant's responses must be such that the defendant purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for "deliberate indifference" to be established.  McGuckin, 974 F.2d at 1060.  Deliberate indifference may occur when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison physicians provide medical care.  Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for deliberate indifference to be established, there must first be a purposeful act or failure to act on the part of

the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  "A defendant must

purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for

deliberate indifference to be established."  Id.  Second, there must be a resulting harm from the

defendant's activities.  Id.  The needless suffering of pain may be sufficient to demonstrate

further harm.  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

        Mere differences of opinion concerning the appropriate treatment cannot be the

basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996);

Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  However, a physician need not fail to

treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v.

City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious

medical condition, even if some treatment is prescribed, may constitute deliberate indifference in

a particular case.  Id.

        In order to defeat defendants' motion for summary judgment, plaintiff must

"produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809

F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an

excessive risk to plaintiff's health," Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511 U.S.

at 837).

        *Qualified Immunity*

        "'Qualified immunity shields federal and state officials from money damages

unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional

right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'"

Hunt v. County of Orange, 2012 WL 432297 at *7 (9th Cir. Feb. 13, 2012) (quoting Ashcroft v.

al-Kidd, 131 S. Ct. 2074, 2080 (2011)).  "A Government official's conduct violates clearly

established law when, at the time of the challenged conduct, 'the contours of a right are

sufficiently clear' that every 'reasonable official would have understood that what he is doing

violates that right.'"  Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (internal alterations

1   omitted).

2          Although the court was once required to answer these questions in order, the

3   United States Supreme Court has clarified that "while the sequence set forth there is often

4   appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 555 U.S. 223,

5   236 (2009). In this regard, if a court decides that plaintiff's allegations do not make out a

6   statutory or constitutional violation, "there is no necessity for further inquiries concerning

7   qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001). Likewise, if a court determines

8   that the right at issue was not clearly established at the time of the defendant's alleged

9   misconduct, the court may end further inquiries concerning qualified immunity without

10  determining whether the allegations in fact make out a statutory or constitutional violation.

11  Pearson, 555 U.S. at 236–42.

12          In resolving the question of qualified immunity, the court views the facts in the

13  light most favorable to the plaintiff. See Schwenk v. Hartford, 204 F.3d 1187, 1198 (9th Cir.

14  2009).

15          *Undisputed Facts*

16          At all relevant times, plaintiff was incarcerated at High Desert State Prison

17  ("HDSP"). At all relevant times, defendant Bartos was a Correctional Officer at HDSP. From

18  July 2009 until January 2011, defendant Bartos was a B-Facility Medical Escort Correctional

19  Officer at HDSP.

20          On August 30, 2009, plaintiff filled out a CDC-7362 Health Care Services

21  Request Form requesting to be seen by the dentist because his gums were swollen and pus and

22  blood were coming out of his gums. (Dkt. 15 at 3.) Plaintiff had penicillin in his cell that he had

23  obtained following a previous tooth infection. (Plaintiff's deposition at 23-25.) The antibiotics

24  did not help. (Id.) Plaintiff's mouth was very painful when he submitted the CDC-7362 Health

25  Care Services Request Form on August 30, 2009. (Id. at 30.) On August 30, 2009, plaintiff had

26  Ibuprofen 800 milligrams in his cell, but it did not stop the pain. (Id. at 32.)

On September 2, 2009, defendant Bartos heard plaintiff being advised over the public address system that he had five minutes to prepare for his appointment. (Dkt. 48-3, Bartos declaration, ¶ 4.) Plaintiff did not hear the advisement over the public address system telling him to prepare for his appointment. (Plaintiff's deposition at 16-18.)

Approximately five minutes after hearing the announcement, defendant Bartos went to plaintiff's cell. (Dkt. 48-3, Bartos declaration, ¶ 4.) Defendant Bartos knew that plaintiff's appointment was in the B-Facility Clinic, but he did not know the purpose of the appointment, i.e., whether it was medical, dental or psychological. (Id.) As will be discussed below, the parties do not dispute that plaintiff was not dressed and ready for his appointment when defendant Bartos arrived at plaintiff's cell. The parties do not dispute that defendant Bartos told plaintiff to get dressed. The parties do not dispute that plaintiff asked for additional time to get ready and defendant Bartos refused this request. The parties do not dispute that defendant Bartos left plaintiff's cell without escorting him to the dental appointment.

In his declaration, defendant Bartos describes how inmates were taken to their appointments at B-Facility at HDSP, where plaintiff was housed on September 2, 2009. These procedures are undisputed. During a lockdown, three officers are responsible for locating inmates and escorting them from their housing units to the B-Facility Clinic for their appointments, and then escorting them back to their housing units once their appointments are completed. (Id. at 3.) Each morning, defendant Bartos receives a ducat list. (Id.) A ducat list is a scheduling list identifying the inmates who have appointments for the day at the B-Facility Clinic. (Id.) The B-Facility Clinic has a triage line, a doctors line, a dental line and a psychology line. (Id.) On average, approximately 75 inmates need to be escorted to and from the B-Facility Clinic when the B-Facility is on lockdown. (Id.)

On September 2, 2009, B-Facility was on lockdown because there was intelligence gathered that a Sensitive Needs Yard ("SNY") gang, known as 25 or 2-5, had manufactured handcuff keys. (Id. at 5.) The information gathered indicated that the plan was for

a member of the 25 or 2-5 gang to go to the B-Facility Clinic, use the handcuff key to unlock his restraints, and stab or assault a rival gang member or a staff member in the B-Facility Clinic. (Id.)  Because of this information, B-Facility was on lockdown and thus, an inmate, before being removed from his cell for an appointment, was required to go through an unclothed body search. (Id.)  This procedure included an inmate removing his clothes while he was located inside of his cell and handing his clothing to the correctional officer who was located outside of his cell so that the officer could search the inmate's clothing for any manufactured handcuff keys.  (Id.)  The procedure also included a visual search of the inmate's body while the inmate was still located inside of his cell.  (Id.)

On September 2, 2009, approximately 75 inmates in B-Facility needed to be taken to the Clinic for their appointments.  (Id. at 6.)  Delays in escorting inmates to appointments in the Clinic cause other inmates to miss their appointments, which causes inmates to become upset, agitated or angry over missing their appointments, and can cause a backlog in the B-Facility Clinic for doctors, dentists, clinicians and staff.  (Id.)

On September 3, 2009, plaintiff filed out a CDC 7362, which was received on September 4, 2009.  (Dkt. No. 49 at ¶ 7.)  In this request, plaintiff stated that his tooth filling had fallen out, his partial denture was irritating his gums, and there was blood and pus coming out of his gums.  (Id.)

On September 5, 2009, a nurse examined plaintiff for complaints of lower right tooth abscesses.  (Id. at 8.)  Plaintiff said he had pus and bleeding and that it hurt all the time. (Id.)  The nurse noted that plaintiff's right tooth appeared decayed with blood draining from the gums.  (Id.)  The nurse noted that plaintiff was missing his lower front four teeth.  (Id.)  The nurse assessed plaintiff with acute pain related to tooth decay.  (Id.)  Plaintiff stated that he carried Ibuprofen on his person and took two tablets daily for pain.  (Id.)  The nurse's plan was for a follow-up with dental on Tuesday, September 8, 2009.  (Id.)

On September 8, 2009, Dr. Kaur examined plaintiff for complaints regarding his

filling that had fallen out, irritated gums and his pus and blood problems.  (Id. at 9.)  During this examination, Dr. Kaur noted that plaintiff had multiple missing teeth and a lower partial denture. (Id.)  As for tooth # 28, Dr. Kaur noted that it had a lateral periodontal abscess present, was very tender on palpation and percussion, pus exudated on palpation, and that plaintiff had had swelling the previous few days, but he had drained the pus himself by squeezing the abscess. (Id.)  Dr. Kaur also observed that tooth # 28 had a 2-3 mm of gingival recession present with exposed roots and heavy supra and subgingival calculus and inflamed gingiva (gums).  (Id.) Tooth # 28 was also categorized as grade 1 mobility.  (Id.)  Grade 1 is assigned to a tooth in which mobility is perceptible, but less than 1 mm buccolingually.  (Id.)  Dr. Kaur assessed and diagnosed that plaintiff's tooth # 28 had a lateral periodontal abscess and was a periodontally hopeless tooth.  (Id.)

On September 8, 2008, x-rays of plaintiff's mouth were taken.  (Id. at 10.)  Fifty percent of the bone on the mesial side of plaintiff's tooth # 28 was missing.  (Id.)  The mesial side of the tooth refers to the direction towards the anterior midline in a dental arch, as opposed to distal, which refers to the direction towards the last tooth in each quadrant.  (Id.)

On September 8, 2009, Dr. Kauer prescribed penicillin for plaintiff with directions to take two tablets immediately and one tablet every day until they were gone.  (Id. at 11.) Plaintiff was also prescribed Ibuprofen 400 mg for 24 days with directions to take one tablet every six hours daily as needed.  (Id.)  Dr. Kaur's plan at the next visit was to extract plaintiff's tooth # 28.  (Id.)

On September 15, 2009, Dr. Lewis extracted plaintiff's tooth # 28.  (Id. at 13.) On September 22, 2009, plaintiff had a post-operation follow-up appointment with Dr. Lewis. (Id. at 14.)  Dr. Lewis noted that plaintiff had no discomfort and the area was healing within normal limits.  (Id.)

////

////

1    *Disputed Facts*

2    The facts regarding what occurred when defendant Bartos arrived at plaintiff's

3    cell on September 2, 2009, to take plaintiff to his dental appointment are somewhat disputed.

4    In his verified complaint, plaintiff alleges that defendant Bartos asked him if he

5    wanted to go to the Clinic.  (Dkt. No. 15 at 3.)  Plaintiff replied, "yes."  (Id.)  Defendant Bartos

6    told plaintiff to get dressed.  (Id.)  Plaintiff asked defendant if he could take a few minutes to get

7    dressed and brush his teeth.  (Id.)  Defendant Bartos told plaintiff "no," and to get dressed now or

8    he was not going because "I don't give a fuck."  (Id.)  Plaintiff asked him again for more time to

9    get dressed and to brush his teeth.  (Id.)  Plaintiff told defendant Bartos that he did not want to

10   talk to him anymore, but he just wanted him to take him to his dentist appointment.  (Id.)

11   Plaintiff alleges that defendant Bartos then replied, "Fuck it then," and then left.  (Id.)

12   According to defendant Bartos, when he arrived at plaintiff's cell, plaintiff was

13   not dressed and was laying on his bunk.  (Dkt. 48-3 at ¶ 4.)  Defendant Bartos states that he told

14   plaintiff to get ready, but plaintiff became argumentative and told defendant that he would have

15   to wait for him and that he would be ready in ten minutes.  (Id.)  Defendant Bartos told plaintiff

16   to get ready, but plaintiff continued to argue.  (Id.)  Defendant Bartos states that he asked plaintiff

17   if he was refusing to go his dental appointment, and plaintiff stated, "yes."  (Id.)  After plaintiff

18   refused to go to his appointment, defendant left to take other inmates to the Clinic.  (Id.)

19   In his declaration, defendant Bartos also states that plaintiff's refusal to come out

20   of his cell to go to the appointment interfered with his duties as an escort officer.  (Id. at 6.)

21   *Analysis:  Did Defendant Bartos Violate Plaintiff's Eighth Amendment Rights?*

22   Defendant argues that he did not violate plaintiff's Eighth Amendment rights

23   because the alleged delay in appointments caused by his failure to take plaintiff to the Clinic on

24   September 2, 2009 did not cause plaintiff to lose his tooth.  To demonstrate deliberate

25   indifference based on a delay in medical treatment, plaintiff must demonstrate that the delay led

26   to further injury.  McGuckin, 974 F.2d at 1060; see also Hallett v. Morgan, 296 F.3d 732, 746

1  (9th Cir. 2002) ("Plaintiffs could not prove an Eighth Amendment violation because they have

2  not demonstrated that delays occurred to patients with problems so severe that delays would

3  cause significant harm and that defendants should have known this to be the case. . .")

4       Defendant has provided unopposed expert evidence that the delay in treatment,

5  from September 2, 2009, to September 8, 2009, when plaintiff saw Dr. Kaur, did not cause

6  plaintiff to lose his tooth.  Defendant has provided the declaration of Dr. Clyde Hopson, a dentist

7  who reviewed plaintiff's relevant records.  In his declaration, Dr. Hopson states, in relevant part,

> 15.  On November 4, 2009, during NGUYEN's interview with Dr. Kauer, she explained to NGUYEN the causes and consequences of periodontal disease and explained to NGUYEN that the delay in his appointment by a few days, from September 2, 2009 to September 8, 2009, did not make him lose tooth # 28.  Dr. Kaur explained that periodontal disease is chronic and asymptomatic, with occasional acute flare-ups, until it reaches the advances stages which had happened in NGUYEN's case with tooth # 28....
>
> 16.  Based on my dental training and experience, in my opinion, I agree with Dr. Kauer's diagnosis and treatment on September 8, 2009 that NGUYEN's # 28 tooth was periodontally hopeless and needed to be extracted on September 15, 2009.  NGUYEN had chronic severe periodontitis. It is a bacterial infection that results in irreversible destruction of the periodontium:  the bone and tissue that surrounds the tooth.  The tissue destruction is not a continuous process. There are periods of disease inactivity followed by short periods of destruction, and the destruction does not occur in all parts of the mouth at the same time.  NGUYEN's diagnosis of chronic severe periodontitis meant that he had loose, bloody gingiva and severe bone loss around his tooth and in fact, almost half of the bone tissue was gone.  Tooth # 28 also had 2-3 mm of gingival recession with exposed roots, heavy supra and subgingival calculus, inflamed gingiva and grade 1 mobility.  This amount of bone loss, gum recession calculus and mobility could not happen in six days.
>
> 17.  Based on my dental training and experience, I also agreed with Dr. Kaur's explanation that the delay in treatment from September 2, 2009 to September 8, 2009 did not cause NGUYEN to lose his tooth # 28.  In fact, if NGUYEN had been seen for his dental appointment on September 2, 2009, it would have made no difference in NGUYEN's diagnosis or treatment because his tooth # 28 would still have been extracted.  Dr. Kaur could not save tooth # 28 due to severe bone loss and numerous periodontal problems associated with tooth # 28.  NGUYEN could not develop chronic severe periodontitis in six days. Consequently, the short

13

1      delay in his treatment did not alter the diagnosis or treatment.

2  (Dkt. No. 49 at ¶¶ 15-17.)

3      Defendant's unopposed expert evidence demonstrates that the delay in plaintiff's

4  dental appointments did not cause plaintiff to lose his tooth.  Accordingly, based on defendant's

5  unopposed expert evidence, the undersigned finds that defendant did not act with deliberate

6  indifference with regard to plaintiff's tooth loss.

7      Plaintiff also alleges that he suffered pain as a result of the delay in treatment.

8  Arguably, plaintiff would have had tooth # 28 extracted earlier and been out of pain sooner had

9  the alleged delay in appointments not occurred.  Because the delay may have caused plaintiff to

10  suffer additional pain, the undersigned cannot find that defendant Bartos did not violate

11  plaintiff's Eighth Amendment rights based on plaintiff's claim for damages regarding pain.

12      *Analysis:  Did Defendant Bartos Violate Clearly Established Law?*

13      For reasons stated herein, the undersigned finds that viewing the facts in the light

14  most favorable to plaintiff, defendant Bartos is entitled to qualified immunity because a

15  reasonable correctional officer would not have known that failing to take plaintiff to his dental

16  appointment violated plaintiff's Eighth Amendment right to adequate medical care.

17      It is undisputed that on September 2, 2009, B-Facility was on lockdown, which

18  required defendant Bartos to conduct unclothed body searches of all inmates he escorted to the

19  Clinic.  It is also undisputed that delays in escorting inmates to the Clinic could cause other

20  inmates to miss their appointments and cause delays at the Clinic.  It is undisputed that when

21  defendant Bartos arrived at plaintiff's cell on September 2, 2009, he reasonably expected plaintiff

22  to be ready for his appointment.  It is undisputed that plaintiff was not ready for his appointment

23  when defendant arrived.  It is undisputed that defendant Bartos was willing to give plaintiff  time

24  to get dressed.  According to plaintiff, when he asked for extra time to brush his teeth, defendant

25  Bartos refused this request.  When plaintiff asked again for extra time, defendant Bartos left.

26  There is no evidence in the record that defendant Bartos was aware that plaintiff was in great

1   pain.

2   Based on the facts described above, the undersigned finds that a reasonable

3   correctional officer would not have known that failing to take plaintiff to his dental appointment

4   violated the Eighth Amendment.  Defendant Bartos refused to take plaintiff to his appointment

5   only after plaintiff twice disputed defendant's refusal to allow plaintiff extra time to brush his

6   teeth.  While brushing one's teeth does not take a significant amount of time, on September 2,

7   2009 B-Facility was on lockdown, and defendant Bartos was clearly time pressed and did not

8   want to cause delays for other inmates or the Clinic.  Defendant Bartos was faced with an inmate,

9   i.e. plaintiff, who was not ready for his appointment when he should have been and then

10  demanded more time than the amount defendant had reasonably offered him to get ready.

11  Defendant Bartos was reasonably concerned that continued "negotiations" with plaintiff would

12  cause delays for other inmates and the Clinic.  In deciding not to take plaintiff to his

13  appointment, defendant reasonably considered the delay plaintiff's behavior caused and the

14  impact on other inmates and the Clinic.  Under these circumstances, and because there is no

15  evidence that defendant Bartos knew that plaintiff was in great pain, a reasonable correctional

16  officer would not have known that failing to take plaintiff to his dental appointment violated the

17  Eighth Amendment.  For these reasons, defendant Bartos is entitled to qualified immunity as to

18  plaintiff's Eighth Amendment claim.

19          B.  Retaliation

20              *Plaintiff's Claims*

21          Plaintiff alleges that defendant Bartos retaliated against him for filing an

22  administrative grievance against him for failing to take him to his dental appointment on

23  September 2, 2009.  In particular, plaintiff alleges that on September 8, 2009, defendant Bartos

24  escorted plaintiff to his annual committee review hearing.  During the hearing, defendant Bartos

25  heard that plaintiff had asked for a transfer to a prison closer to his parents.

26          Plaintiff alleges that when defendant Bartos escorted him back to his building

15

1    after the hearing, defendant Bartos refused to give plaintiff his I.D. card back.  Plaintiff alleges

2    that without the I.D. card, he could not move around the prison.

3          Plaintiff alleges that later that evening, defendant Bartos said to him, "You're

4    waiting for a transfer right?  If you get a 115 that will fuck up your transfer.  See you buddy!"

5          Plaintiff alleges that on October 26, 2009, Sergeant Thompson interviewed

6    plaintiff about his administrative grievance filed against defendant Bartos.  Sergeant Thompson

7    asked plaintiff what he wanted to do about defendant Bartos.  Plaintiff responded that he wanted

8    defendant Bartos to stay away from him and to be prohibited from escorting him.  Sergeant

9    Thompson told plaintiff that he agreed with plaintiff's requests and would inform defendant

10   Bartos.

11         Plaintiff alleges that on November 4, 2009, defendant Bartos insisted that he

12   escort plaintiff back to his building from the Clinic where plaintiff had been interviewed by Dr.

13   Kaur regarding his administrative grievance filed against defendant.  Plaintiff told defendant

14   Bartos that he was not supposed to escort him, per his agreement with Sergeant Thompson.

15   Defendant Bartos grabbed plaintiff's arm and said, "Let's go!"  When they got out of the Clinic,

16   defendant Bartos said to plaintiff, "You don't know who you're fucking with!"  Defendant

17   Bartos called plaintiff names and again threatened him with a rules violation report to stop his

18   transfer.

19         Plaintiff alleges that later on November 4, 2009, defendant Bartos gave plaintiff a

20   115 Rules Violation Report for "behavior which could lead to violence."  There were no

21   witnesses to the incident on which the report was based.  On November 16, 2009, plaintiff was

22   found guilty of the charge and assessed 30 days loss of time credits, 30 days loss of yard and four

23   points were added to plaintiff's custody score.  Three days later, plaintiff was transferred to

24   Salinas Valley State Prison ("SVSP") without the final copy of the disciplinary report.  Without

25   the final copy of the disciplinary report, plaintiff could not file an appeal.

26   ////

*Analysis – Rules Violation Report and Transfer*

Plaintiff alleges that on September 8, 2009, defendant Bartos threatened to file a false rules violation report to stop his transfer in retaliation for his filing of an administrative grievance. Plaintiff goes on to allege that defendant Bartos actually filed the false rules violation report on November 4, 2009.

In his summary judgment motion, defendant treats the September 8, 2009 alleged threat to file the rules violation report as a separate claim from the November 4, 2009 filing of the allegedly false charges. The undersigned does not view these allegations as stating separate claims. Instead, the undersigned finds that plaintiff is alleging that on November 4, 2009, defendant Bartos carried out his threat made on September 8, 2009, to file false charges in order to stop plaintiff's transfer.

Defendant argues that plaintiff's claim alleging that he was issued the rules violation report in retaliation for filing the administrative grievance is barred by Heck v. Humphrey, 512 U.S. 477 (1994). It is undisputed that plaintiff was assessed 30 days of time credits for the disciplinary conviction based on the allegedly false rules violation report.

In Heck v. Humphrey, 512 U.S. 477 (1994), an Indiana state prisoner brought a civil rights action under § 1983 for damages. Claiming that state and county officials violated his constitutional rights, he sought damages for improprieties in the investigation leading to his arrest, for the destruction of evidence, and for conduct during his trial ("illegal and unlawful voice identification procedure"). Convicted on voluntary manslaughter charges, and serving a fifteen year term, plaintiff did not seek injunctive relief or release from custody. The United States Supreme Court affirmed the Court of Appeal's dismissal of the complaint and held that:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance

of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages
bearing that relationship to a conviction or sentence that has not
been so invalidated is not cognizable under 1983.

Heck, 512 U.S. at 486.

The Supreme Court expressly held that a cause of action for damages under § 1983 concerning a criminal conviction or sentence cannot exist unless the conviction or sentence has been invalidated, expunged or reversed. Id.

In Edwards v. Balisok, 520 U.S. 641 (1997), the Supreme Court held that Heck applies to challenges to prison disciplinary hearings when the nature of the challenge to the procedures could be such as necessarily to imply the invalidity of the judgment. See also Cunningham v. Gates, 312 F.3d 1148, 1153 (9th Cir. 2002) (holding that where prison disciplinary action "arising out of the same facts stands and is fundamentally inconsistent with the unlawful behavior for which section 1983 damages are sought, the 1983 action must be dismissed.").

Plaintiff is claiming that defendant Bartos fabricated the charges against him in retaliation for his filing of the administrative grievance. Under these circumstances, a determination that defendant Bartos fabricated the charges would necessarily require that the disciplinary conviction be found invalid. See Balisok, supra, 520 U.S. at 648 (holding that plaintiff's claim that the disciplinary conviction resulted from "deceit and bias on the part of the decisionmaker" was not cognizable under § 1983); Sheldon v. Hundley, 83 F.3d 231, 234 (9th Cir. 1996) (where plaintiff's "First Amendment claims are so entangled with the propriety of the disciplinary result, which triggered the loss of good-time credits, that ruling in [plaintiff's] favor on First Amendment grounds would necessarily imply the invalidity of the disciplinary result and the lengthened sentence [,]" plaintiff's First Amendment claims are barred by Heck ).

In the instant case, plaintiff's allegations that the disciplinary proceedings were initiated against him based on the retaliatory fabrications by defendant Bartos are analogous to the allegations in Balisok and Sheldon, in that the merits of these allegations cannot be

1   disentangled from the validity of the disciplinary conviction itself.[2]  For these reasons, plaintiff's

2   claims that defendant Bartos filed false disciplinary charges in retaliation for plaintiff filing an

3   administrative grievance against him are <u>Heck</u> barred.[3]  Accordingly, defendant is entitled to

4   summary judgment as to this claim.

5                    *Analysis – I.D.*

6                    Plaintiff alleges that on September 8, 2009, when defendant Bartos escorted him

7   back to his building after the annual committee review hearing, defendant refused to return his

8   I.D. card to him.  Plaintiff alleges that without the I.D. card, he could not move around the

9   building.

10                    It is not clear whether plaintiff is making a separate retaliation claim against

11   defendant Bartos based on his alleged refusal to return plaintiff's I.D. card.  The gravamen of

12   plaintiff's retaliation charges against defendant Bartos stem from the allegedly false disciplinary

13   charges.  Defendant did not construe plaintiff's amended complaint to state a retaliation claim

14   based on the allegations regarding the I.D. card as the summary judgment motion does not

15

16           [2]   Courts have reached different conclusions when considering whether <u>Heck</u> bars
     retaliation claims. Compare <u>Woods v. Smith</u>, 60 F.3d 1161 (5th Cir. 1995) (retaliation claims not
17   subject to <u>Heck</u>) with <u>Jackson-El v. Winsor</u>, 986 F.Supp. 440, 444 (E.D. Mich.1997) (claim that
     defendant prepared false disciplinary charge in retaliation subject to <u>Heck</u>).  In the instant case, a
18   determination that defendant Bartos filed false charges against plaintiff in retaliation for filing the
     administrative grievance would necessarily imply the invalidity of the disciplinary conviction.
19   For this reason, the undersigned finds that plaintiff's retaliation claim is <u>Heck</u> barred.  <u>See</u>
     <u>Williams v. Woodford</u>, 2009 WL 3823916 at *3 (E.D. Cal. 2009) (finding claim alleging that
20   disciplinary conviction was based on retaliation to be <u>Heck</u> barred).

21

22           [3]   Although plaintiff's retaliation claims are <u>Heck</u> barred, the undersigned observes that
     plaintiff alleges that defendant Bartos falsely charged with him the rules violation report in order
23   to stop his transfer to a prison closer to his parents.  Three days after being found guilty of the
     rules violation, plaintiff was transferred to SVSP.  At his deposition, plaintiff admitted that
24   defendant Bartos was not able to stop the transfer by filing the false disciplinary charges against
     him. (Plaintiff's deposition at 79.)  While plaintiff had requested a transfer to Mule Creek State
25   Prison ("MCSP") to be closer to his ailing parents, he was instead transferred to SVSP. (<u>Id.</u> at
     80-81.)  MCSP and SVSP are approximately the same distance from plaintiff's parents home in
26   Union City, California. (Dkt. No. 49-3 at 12, 17.)  Plaintiff does not claim that the transfer to
     SVSP was somehow adverse compared to a transfer to MCSP.

address these allegations.

In an abundance of caution, the undersigned construes plaintiff's allegations regarding the I.D. card to state a retaliation claim.  At his deposition, as discussed herein, plaintiff clarified that he is not actually claiming that defendant refused to return the card, but that defendant did not follow-up on his promise to retrieve the card from the Clinic.  For the reasons discussed below, the undersigned recommends that plaintiff's clarified retaliation claim regarding the I.D. card be dismissed as it does not state a cognizable retaliation claim.

At his deposition, plaintiff testified that on September 8, 2009, defendant Bartos escorted him back to his building after the committee hearing.  (Plaintiff's deposition at 54.) Plaintiff had left his I.D. card at the Clinic and the people at the Clinic had forgotten to return it. (Id. at 55.)  Plaintiff asked defendant if he could stop by the Clinic and pick up his I.D. card. (Id.)  Defendant Bartos responded, "don't worry about it."  (Id.)  Defendant told plaintiff to "go ahead" and that he would get it for him later.  (Id. at 55-56.)  Defendant Bartos did not pick the card up for plaintiff.  Plaintiff was able to get his I.D. card back from another officer one or two days later.  (Id. at 56.)

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567–68 (9th Cir. 2005).

An adverse action is action that "would chill a person of ordinary firmness" from engaging in that activity.  Pinard v. Clatskanie School Dist., 467 F.3d 755, 770 (9th Cir. 2006); White v. Lee, 227 F.3d 1214, 1228 (9th Cir. 2000).  The undersigned cannot find that an ordinary prisoner would be inhibited from filing grievances because an officer did not retrieve their I.D. card that the prisoner left in the Clinic.  Defendant Bartos did not take the I.D. card from plaintiff.  Instead, defendant Bartos simply did not retrieve it from the Clinic where plaintiff had

1   left it.  These circumstances do not constitute an adverse action.  For this reason, plaintiff's

2   retaliation claim against defendant Bartos regarding the I.D. card should be dismissed as legally

3   frivolous.  28 U.S.C. § 1915(e)(1) (court may dismiss at any time claims that are legally

4   frivolous).

5          C.  Due Process

6          Plaintiff alleges that he was denied his right to due process when he was

7   transferred to SVSP without a final copy of his rules violation report.  Plaintiff alleges that

8   without the final copy of the report, he could not file an appeal.

9          Defendant moves for summary judgment as to this claim on grounds that he had

10  no involvement in the processing of plaintiff's paperwork following his disciplinary conviction.

11  In his declaration submitted in support of the summary judgment motion, defendant states, "I had

12  no involvement with, nor was it my responsibility to ensure that [plaintiff] received the

13  appropriate paperwork following his Rules Violation hearing."  (Dkt. No. 48-3 at 6.)

14         The Civil Rights Act under which this action was filed provides as follows:

15              Every person who, under color of [state law] . . . subjects, or causes
                to be subjected, any citizen of the United States . . . to the
16              deprivation of any rights, privileges, or immunities secured by the
                Constitution . . . shall be liable to the party injured in an action at
17              law, suit in equity, or other proper proceeding for redress.

18  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

19  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

20  Monell v. Department of Social Servs., 436 U.S. 658, 692 (1978) ("Congress did not intend

21  § 1983 liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976)

22  (no affirmative link between the incidents of police misconduct and the adoption of any plan or

23  policy demonstrating their authorization or approval of such misconduct).  "A person 'subjects'

24  another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an

25  affirmative act, participates in another's affirmative acts or omits to perform an act which he is

26  legally required to do that causes the deprivation of which complaint is made."  Johnson v.

21

1    Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

2            The record contains no evidence contradicting defendant's claim that he was not

3    involved in processing plaintiff's paperwork following his disciplinary conviction.  Accordingly,

4    because defendant has presented uncontroverted evidence that he was not involved in the alleged

5    deprivation, defendant should be granted summary judgment as to this claim.

6            Accordingly, IT IS HEREBY ORDERED that plaintiff's request for appointment

7    of counsel contained in his May 3, 2012 letter (Dkt. No. 57) is denied; and

8            IT IS HEREBY RECOMMENDED that defendant's summary judgment motion

9    (Dkt. No. 48) be granted.

10           These findings and recommendations are submitted to the United States District

11   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

12   one days after being served with these findings and recommendations, any party may file written

13   objections with the court and serve a copy on all parties.  Such a document should be captioned

14   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

15   objections shall be filed and served within fourteen days after service of the objections.  The

16   parties are advised that failure to file objections within the specified time may waive the right to

17   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18   DATED:  May 29, 2012

19

20

21                                                  KENDALL J. NEWMAN
                                                    UNITED STATES MAGISTRATE JUDGE

22   nguy1461.sj

23

24

25

26